(C. D. 470)

CENTRAL VERMONT RAILWAY, INC. v. UNITED STATES

United States Customs Court, Third Division

(Decided April 18, 1941)

*McFeeters & Kissane; Percy C. Warner*, associate counsel (*John G. Kissane* of counsel), for the plaintiff.

*Charles D. Lawrence*, Acting Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an action against the United States in which the plaintiff seeks to recover certain sums of money claimed to have been illegally collected and paid as customs duties on entry of merchandise designated on the invoices as dried whey powder which came into the United States at the port of St. Albans, Vt. It was manufactured by the Champlain Milk Products Co. of Stanbridge, Province of Quebec, Canada.

The collector of customs assessed duty thereon at the rate of 1½ cents per pound under paragraph 708 (b) of the Tariff Act of 1930, as amended by the Canadian Trade Agreement (T. D. 49752), by virtue of the similitude clause in paragraph 1559 of that act. Plaintiff claims that it is properly dutiable under the provisions of paragraph 1558 of said act as an unenumerated manufactured article at the rate of 20 per centum ad valorem.

We set out the pertinent provisions of the statute as follows:

708 (b) as amended.
Dried buttermilk, 1½ cents per pound.
PAR. 1559. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *.
PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of

10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Mr. Ross M. Preston, president of the Champlain Milk Products Co. which manufactured the merchandise, testified in behalf of the plaintiff, basing his testimony upon 15 years' experience in the business of producing milk products, fortified by a course in dairy chemistry while in college. He stated that his concern manufactured a complete line of dairy products including buttermilk powder, casein, and other milk byproducts. He stated that this product is dried whey powder made from whey in the manufacture of casein. He also stated that:

Dried buttermilk is the solid content of buttermilk residue from the manufacture of butter, from which fully 98% of the moisture has been removed.

And further, he stated:

Dried whey is the solid content remaining in whey, from which the protein of skimmed milk has previously been removed during the process of manufacturing casein. That applies to our particular product. It may also apply to whey resulting from the manufacture of cheese from which the protein has also been removed in the form of cheese curd.

He defined whey as a residue from the manufacture of either casein or cheese. It may be one or the other, but prior to that skimmed milk is used as the base, and through the process of coagulation you can either make the protein in that skimmed milk into cheese or into casein.

He gave the following testimony:

By Mr. WARNER.

*   *   * Q. Would you mind starting with milk and follow down one side to the buttermilk and next to the whey?—A. We commence with milk, which contains normally approximately 3½% of butter fats; it contains approximately 5% of milk sugar, or lactose; it contains approximately 4% of protein, which is divided approximately 75%, or 3% as casein and 1% as lacteal albumen; and there is also a relatively small percentage of milk ash; or it contains milk in itself approximately 12½% of milk solids, made up of fats, which is the chief ingredient from the basis of value, proteins, lactose, and the milk solids. The milk is brought into the creamery, the fat is separated, cream results in the separation of the fats on the one hand and on the other hand skimmed milk results—the division takes place at the separator, cream at one side, as I said, which contains fat, and on the other hand the skimmed milk, which contains all of the solids practically of the milk that are not present in the fat with the exception of that part of the milk that is in the solid part of the cream, which is necessary to hold the fat. You cannot make a 100% extraction of the fat through separation. The cream with which we are now concerned in the process of manufacturing buttermilk powder, is introduced into the churn, and through agitation the fat globules in the cream are turned into butter, and subsequently sold as butter fat in the form of butter. The remainder of the milk serum, the solids which were in the cream can, and in this case are dried through a process of running the liquid buttermilk——

Judge OLIVER. Just a moment. You have made butter from that fat?

The WITNESS. We have made butter from the fat.

Judge OLIVER. And the residue is the buttermilk?

The WITNESS. That is liquid buttermilk.

Judge OLIVER. Now we have liquid buttermilk?

The WITNESS. Now we have liquid buttermilk. That liquid buttermilk is run over what we call atmospheric roller drum driers. The heat from those rollers evaporates practically all of the water contained in the liquid buttermilk, and leaves a very thin coating of the milk solids that remain in the buttermilk after the separation of the fat. After the fat is removed that film on the outside of the heated rollers is scraped off in the form of a very thin tissue-like substance, which is subsequently ground and emerges in the form of a powder, and is incorporated in various animal feed products and poultry feed products.

### The witness described the process of making dried whey as follows:

By Mr. WARNER.

* * * Now we come to the manufacture of whey powder. Whey powder can be manufactured in two different ways. Would you like me to explain both ways or the one which we use ourselves?

Q. The one which you use yourself.

Judge OLIVER. At this point, Mr. Preston, may I ask—there is nothing on the record to show that the process you are describing is the process used in Canada to manufacture the particular whey imported.

The WITNESS. We are the manufacturers of this product.

Judge OLIVER. I thought you were the consignee in St. Albans.

The WITNESS. We are the manufacturers of this product. I am speaking as the manufacturer, and exporter and importer, because we laid the product down on the duty paid basis. Now, the manufacture of whey as we make it in our particular plant, we start again with whole milk. The fat is removed through the separation, as in the case of buttermilk. That fat may be either sold as fluid cream or it may be manufactured into cream exactly as in the case where we described the process in the manufacture of butter. Skimmed milk in this case is left over from the separation of the whole milk. Now, skimmed milk contains approximately 9% of total solids; 4% of that is in the form of proteins, approximately 5% is in the form of milk sugar, or lactose, and about 1% is in the form of milk salts. Now, the protein, as I said, is approximately 4% in skimmed milk, and is divided into two types of protein; one we generally call casein, which coagulates through the use or addition of certain acids, or rennet. The other protein, which is only approximately one quarter of the 4%, what we call milk albumen, which can be coagulated, so far as I know, only through the use of heat treatment. We are interested now in the coagulation of the protein from the skimmed milk in the manufacture or casein. We are not interested in recovering at this point the albumen. The casein is coagulated through the addition of any one of a certain definite number of acids, sulphuric, muriatic, or other types. The coagulation results in a curd, which is later ground and dried and sold through commercial channels as casein. Now, after the protein, that is, the casein part of the protein has been coagulated we have left still a sugar or lactose. We have the 1% of milk albumen, and we have about 1% of milk salt.

Judge OLIVER. That is still in the liquid form?

The WITNESS. That is still in the liquid form. Approximately at this point it contains about 6% of solids and about 94% of water. Ordinarily most manufacturers consider that from this point a waste product. It is either run down the sewer or thrown out on the land, perhaps as fertilizer. In our case we have a manufacturing process for recovering the solids remaining in the whey. The whey——

Judge OLIVER. What is whey?

The WITNESS. Whey is what is left of the skimmed milk after the protein—the casein has been removed.

Judge OLIVER. That is the liquid which you say contains 6% of solids, is usually thrown away; that is whey in that form?

The WITNESS. That is whey. It is usually thrown away.

Judge OLIVER. That is whey?

The WITNESS. That is whey. We introduce that into a condensing pan and remove, through the process of vacuum evaporation, approximately seven times; we reduce that to a point where the whey has now a solid content of approximately 60% of solids, the water having been removed through the process of evaporation under vacuum. That is in the form of a soft sugar consistency, somewhat like soft maple sugar, which most Vermont people have seen at one time or another. We carry the process still further by grinding this sugar up, placing it on trays in a drying panel, and removing as much of the extra moisture as we can through the process of air drying, until we end up with a product that is almost 98% dried material, only 2% of moisture remaining in it; and that material contains inversely the same relative percentages of sugar, and proteins, and milk ash that we started with in the fluid material before we went through these two different processes of drying and removing the moisture.

Thereupon the witness produced and there were received in evidence and marked illustrative exhibits 3 and 4, samples of dried whey and dried buttermilk before being reduced by grinding into powder form. This witness also identified and there was received in evidence (illustrative exhibit 5) dried whey powder, and dried buttermilk powder (illustrative exhibit 6). These powders represent the finished products of dried whey and dried buttermilk respectively.

Mr. Warren S. Baker, director of the research department of Charles M. Cox Co. of Boston, which he describes as the parent organization of the St. Albans Grain Co., testified on behalf of the plaintiff. He stated that his concern maintains chemical and biological laboratories and experimental poultry farms, and that he has charge of all the chemical work; that he has a staff of five chemists operating under his supervision; that he is familiar with the manufacture of poultry and animal feeds, their chemical content and their nutritive values; that he also is familiar with the product known as dried whey powder. He identified by name the various exhibits produced in evidence. With reference to the products which he identified he stated:

Obviously, these products are fractions of whole milk that has been processed. Due to the system of fractionation the percentage of the various constituents of milk differ. For instance, protein; one of the constituents will average from 12 to 12½% in dried whey, and it will average from 33% to 36% in dried buttermilk. In lactose content the dried whey will be in the neighborhood of 70%, and the milk sugar content of dried buttermilk on the other hand will be down around 35% to 38%. Dried whey only has about one-half percent of butter fat, whereas dried buttermilk will contain about 5%. Milk minerals,—there would be perhaps 2% more minerals in dried whey than in dried buttermilk. The moisture content will be substantially the same. Those are the ordinary chemical characteristics we think of.

He further stated that both dried whey powder and dried buttermilk powder are used in poultry feed and animal feed, but it is not practical to use such products separately; each constituted a component or ingredient of an entire ration. When asked if dried buttermilk and dried whey could be used interchangeably he answered:

Not to take one pound of dried buttermilk from a formula and substitute one pound of dried whey, no, sir. Their nutritive characteristics are so different that compensation would have to be made for the deficiency of one over to the other.

He stated that both products contained protein, but the buttermilk powder contains the complete protein and the dried whey powder does not; that the similarity between the two products, in his opinion, consisted of the fact that they are both feed ingredients. He further stated that they cannot be used identically because they are not identical substances. This witness stated that these commodities are different in material, quality, and texture. Nevertheless he stated on cross-examination that they are both used for the same purpose, that is, as ingredients of poultry feed. It appears that the difference in quality as outlined by this witness, was the result largely of different chemical content, there being more protein in one than in the other.

It therefore becomes necessary to consider whether the statutory degree of similitude between dried whey powder and dried buttermilk powder has been proven by the plaintiff's evidence to be lacking, in order to overcome the presumption of correctness attaching to the collector's assessment. A summary of the testimony shows that there is no substantial similitude in material, quality, or texture of the two commodities. However, it has been held that a similarity in use is sufficient. *United States* v. *Dana et al.*, 99 Fed. 433. That case involved the question whether ferrochrome was dutiable by similitude to ferromanganese, or as a nonenumerated article, and arose under the Tariff Act of 1894. The court used the following language in deciding that the two commodities were similar in the use to which applied:

In the present case the two articles are used in the treatment of iron ore to produce a steel of peculiar properties. It would seem that similitude between two articles is established when the predominant use of both is to effect in a particular art or process the same concrete result. However that may be, there is in the present case a closer criterion of similarity. The use of both is to effect in the smelting of iron ore the elimination of objectionable properties, and in accomplishing this result one is the equivalent of the other. Moreover, the subordinate result effected by each resembles that of the other. The result accomplished by the ferrochrome in counteracting the phosphorus in the ore is analogous to that of the ferromanganese in counteracting the sulphur. The uses of the two articles, though not identical, are affiliated. The section does not require identity, but is satisfied by similarity in uses.

We think that reasoning when applied to the instant case discloses a similarity in use between dried whey powder and dried buttermilk powder. Both are used as ingredients in feed. While they cannot be used identically, nevertheless they are both used in making poultry feed. It is true that the protein content of the two commodities differs, but under the reasoning of the case cited we think that fact is not sufficient to prove dissimilarity of use. They are both fed to poultry, together with other ingredients. In the *Dana* case, *supra*, the two commodities were used in the process of manufacturing steel, their distinct use being as an admixture with iron ore. One was selected when the iron ore had an excess of phosphorus and the other when it contained an excess of sulphur. So in the present case it may very well be that the dried whey powder, being less rich in its protein content, is used in a mixture where the other ingredients contain a rather high protein content. The testimony discloses that in the manufacture of poultry feed various ingredients are used besides dried whey powder or dried buttermilk powder, such as wheat bran, wheat middlings, corn meal, oats in their various forms, meal scrap, fish meal, liver meal, gluten meal, calcium carbonate, bone meal, and salt. The witness admitted that there would be certain feeds in which some of the ingredients named would not be used, but that the enumerated commodities ordinarily are used.

We think upon the record that a substantial similarity in use exists between the two commodities and that the collector's assessment at the rate of 1½ cents per pound under paragraph 708 (b), as amended by the Canadian Trade Agreement, should be and the same is hereby affirmed.

Judgment will be rendered accordingly. It is so ordered.